**UNITED STATES of America, Plaintiff,**

v.

**Herbert A. DANIELS, Defendant.**

**No. CRIM.A. 01–40002–01–KHV.**

United States District Court, D. Kansas.

March 7, 2002.

---

Richard L. Hathaway, Tanya J. Tredway, Office of United States Attorney, Topeka, KS, for Plaintiff.

Scott K. Logan, Fred J. Logan, Jr., M. Bradley Watson, Jeff K. Brown, Logan & Logan, L.C., Prairie Village, KS, Thomas J. Bath, Jr., Bath & Edmonds P.A., Overland Park, KS, Jeffrey D. Morris, Berkowitz, Feldmiller, Stranton, Brandt, Williams & Stueve, LLP, Prairie Village, KS, for Defendant.

Herbert A. Daniels, Leawood, KS, Pro se.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

On December 3, 2001, a jury found defendant guilty of 33 counts of health care fraud, seven counts of mail fraud and three counts of perjury. This matter is before the Court on defendant's Motion For Judgment Of Acquittal And New Trial (Doc. # 183) filed December 13, 2001. After carefully considering the parties' briefs, the Court overrules defendant's motion.

### Standards For Motions For Judgment Of Acquittal

In considering a motion for judgment of acquittal pursuant to Rule 29, Fed.R.Crim.P., the Court cannot weigh the evidence or consider the credibility of witnesses. See *Burks v. United States*, 437 U.S. 1, 16, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). Rather, the Court must "view the evidence in the light most favorable to the government and then determine whether there is sufficient evidence from which a jury might properly find the accused guilty beyond a reasonable doubt." *United States v. White*, 673 F.2d 299, 301 (10th Cir.1982). The jury may base its verdict on both direct and circumstantial evidence, together with all reasonable inferences that could be drawn therefrom, in the light most favorable to the government. See *United States v. Hooks*, 780 F.2d 1526, 1531 (10th Cir.), cert. denied, 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986). Acquittal is proper only if the evidence implicating defendant is nonexistent or is "so meager that no reasonable jury could find guilt beyond a reasonable doubt." *White*, 673 F.2d at 301.

### Standards For Motions For New Trial

Rule 33, Fed.R.Crim.P., provides that a motion for a new trial may be granted "if required in the interest of justice." A motion for new trial under Rule 33 is not regarded with favor and is granted only with great caution. See *United States v. Custodio*, 141 F.3d 965, 966 (10th Cir. 1998). The decision whether to grant a motion for new trial is committed to the sound discretion of the trial court. See *id.*

### Factual Background

In July and August of 2000, before this prosecution was commenced, defendant was tried before a jury in federal court in Topeka, Kansas on substantially the same charges.[1] The jury was unable to reach a

1. In the first trial, defendant was charged with health care fraud, mail fraud and engaging in monetary transactions in property derived from unlawful activities. In this prosecution, defendant is not charged with engaging in monetary transactions in property derived from unlawful activities, but he is charged with health care fraud, mail fraud,

verdict. Shortly before that trial, on June 12, 2000, Dr. Thomas Kidder executed an engagement letter with defense counsel, in which he agreed to serve as an expert for defendant. The engagement letter stated in part that "[i]n accepting this engagement, you are also agreeing not to accept any other engagement as an expert at any time with any other person or entity relating to these same parties, unless otherwise agreed to in writing by this law firm and the client [Dr. Daniels]." See Herbert Daniels' Motion To Exclude Cumulative Government Expert Dr. Thomas Kidder (Doc. # 164) filed November 14, 2001, Attachment 1 at 2. Defendant did not utilize Dr. Kidder as a testifying witness in the first case, but Dr. Kidder accepted payment from the defense.

On October 4, 2000, the government asked Dr. Kidder to be an expert witness on its behalf. On October 16, 2000, Dr. Kidder's counsel wrote to government counsel, explaining that his retainer agreement with defense counsel at the first trial provided that without the agreement of defendant and his attorneys, he could not accept another engagement as an expert in the matter. The government subsequently issued a grand jury subpoena to Dr. Kidder and filed a motion to compel his testimony. Defendant intervened and opposed the motion to compel. Defendant argued that the retainer agreement prohibited Dr. Kidder from testifying and in the alternative, that the work product privilege protected disclosure of information which Dr. Kidder had learned while he worked for defendant. On December 28, 2000, the Honorable Sam A. Crow sustained the government's motion in part. Judge Crow ruled that (1) the retainer agreement by itself was insufficient to deny compulsion of the subpoena and (2) Dr. Kidder could provide grand jury testimony based solely on information which the government provided, without his testimony being influenced by work product or confidential communications shared with Dr. Daniels. See Memorandum And Order filed December 28, 2000 in D. Kan. Case No. 00–MC–408–SAC at 22. Judge Crow specifically declined to address whether Dr. Kidder could serve as an expert witness at trial or whether the engagement letter was enforceable in subsequent criminal proceedings. See id. at 23–24.

On February 14, 2001, a grand jury returned a first superseding indictment which charged defendant with 36 counts of health care fraud in violation of 18 U.S.C. § 1346, seven counts of mail fraud in violation of 18 U.S.C. § 1341 and four counts of perjury in violation of 18 U.S.C. § 1623(a). See First Superseding Indictment (Doc. # 12). The indictment alleges that defendant committed a scheme to defraud patients and health care benefit programs of money, and to defraud his patients of the intangible right to honest services. Id. ¶ 1. The indictment alleges that defendant's scheme included (1) billing for services not rendered; (2) "upcoding" (charging for a service reimbursable at a higher rate than appropriate for the service actually provided, which would make more money for defendant); (3) luring patients to surgery, which could cause and did cause bodily injury and serious bodily injury to patients; and (4) covering up his fraud by creating false documents and providing false testimony. Id.

The first superseding indictment charges that defendant employed the following patterns or practices to execute his scheme:

   a. billing for sham surgeries, that is surgery procedures he claims to have performed but could not have performed

and four counts of perjury arising in part from his testimony at the first trial. The

fraudulent scheme alleged in the two cases is essentially the same.

in time frames of as little as 5 minutes to 35 minutes, no matter the number or complexity of the procedures ostensibly performed;

b. upcoding, that is, misrepresenting the service provided by charging for a procedure which would make more money for him, but which he did not perform;

c. covering up his false billings and fraud against his patients, including the following patterns of falsification:

(1) training residents to "tap dance on the charts," that is, falsify patient charts and histories and physicals to justify treatment;

(2) falsifying documents including: correspondence, history and physical reports, and operative reports to justify procedures recommended and/or ostensibly performed, including but not limited to falsifying patient complaints and symptoms, falsifying assessments, and falsifying informed consent from patients;

(3) falsifying documents concerning the patient's condition following surgery, to make it appear the patient was doing well after surgery, when in truth and in fact, patients were continuously complaining to him about debilitating pain and loss of hearing after surgery, or the defendant had worsened a patient's condition and caused bodily injury and serious bodily injury to the patient;

(4) falsely testifying under oath regarding material facts to conceal his scheme;

d. luring patients into surgery with false representations and omissions of material information, including:

(1) concealing from patients material and recognized complications, risks and alternatives to surgery;

(2) concealing the fact he was performing or claiming to perform procedures for which he intended to and did bill;

(3) scare tactics, such as suggesting the presence of cancer and the immediate need for surgery to prevent hearing loss;

(4) guaranteeing results;

(5) representing that the surgery was virtually painless;

(6) exaggerating conditions, such as representing to patients that they had the worst deviated septum Daniels had ever seen; and

(7) representing that his sinus surgeries produced little or no bleeding, when he knew that his blood loss was pronounced; and

e. utilizing these false billings, false documents, false representations and omissions of material information to optimize, and attempt to optimize, his billing of health care benefit programs.

*Id.* ¶ 17. The indictment also charges that defendant (1) represented to patients that they required surgery or diagnostic procedures at a hospital when in fact, they could have been treated or tested in the office, see *id.* ¶¶ 18–19, and (2) obtained sufficient tissue, bone and/or cartilage from the patient while under anesthesia, to obtain a pathology report that would ostensibly justify his surgery recommendation, see *id.* ¶ 20.

Based on the foregoing scheme to defraud, the indictment charges defendant with health care and mail fraud. The fraud charges in this action include many of the charges brought against defendant at the first trial. In addition to the fraud charges, defendant is charged in this action with four counts of perjury arising in part from his testimony at the first trial.

In April of 2001, the government notified defense counsel of several expert witnesses it might call at trial, including Dr. Kidder. From September 25, 2001 through November 28, 2001, defendant was tried before a jury. During its case in

chief, the government called approximately 70 witnesses, including many of defendant's patients as well as expert witnesses including Dr. Jacquelyne Holdcraft, defendant's former partner, and Dr. Dale Rice. At a sidebar conference in early November, the government stated that it would probably call Dr. Kidder in rebuttal. On November 14, 2001, defendant asked the Court to exclude Dr. Kidder because of his prior contractual agreement with defense counsel. See Herbert Daniels' Motion To Exclude Cumulative Government Expert Dr. Thomas Kidder (Doc. # 164). The Court overruled defendant's objection and allowed Dr. Kidder to testify as an expert witness for the government.

On December 3, 2001, after three days of deliberation, the jury found defendant guilty of 33 counts of health care fraud, seven counts of mail fraud and three counts of perjury. The jury acquitted defendant of three counts of health care fraud and one count of perjury.

Defendant seeks judgment of acquittal on the three perjury counts and a new trial on the remaining counts.

## Analysis

### I. Timeliness Of Defendant's Motions

Regrettably, the Court must first analyze whether defendant timely filed his post-trial motions.

Any motion for judgment of acquittal must be filed no later than seven days after the jury is discharged or within such further time as the Court may fix during the seven-day period. See Fed.R.Crim.P. 29(c). Any motion for a new trial must be filed no later than seven days after the verdict or within such further time as the Court may fix during the seven-day period. See Fed.R.Crim.P. 33. Because both of these seven-day periods have expired, the Court cannot extend the deadline for defendant to file either motion. See Fed. R.Crim.P. 45(b).

Defendant filed his motions for judgment of acquittal and a new trial on December 13, 2001, eight days after the jury had been discharged (excluding weekends) and eight days after the jury returned the verdict (excluding weekends). Accordingly, the Court does not have jurisdiction to entertain defendant's motions. See *Carlisle v. United States*, 517 U.S. 416, 420, 116 S.Ct. 1460, 134 L.Ed.2d 613 (1996); *United States v. Stevens*, 978 F.2d 565, 569 (10th Cir.1992); *United States v. Miller*, 869 F.2d 1418, 1420 (10th Cir.1989). Even if the Court had jurisdiction to hear defendant's motions, however, defendant would be entitled to very limited relief—a judgment of acquittal on two perjury charges which would likely be immaterial in sentencing because of his conviction on 33 health care fraud charges (including one involving substantial bodily injury to a patient), seven mail fraud charges and one perjury charge.

### II. Defendant's Motion For Judgment Of Acquittal

On Counts 46 and 47, defendant argues that the government did not present sufficient evidence for a reasonable jury to find that his testimony was material. At trial, the Court instructed that to convict defendant of perjury, the government must prove beyond a reasonable doubt that "defendant's statements were material to the issues under inquiry by the court." Instruction No. 33. The Court further explained that "a statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the jury on any proper matter, including the issue of credibility." Instruction No. 36. The prosecution ordinarily proves materiality "by introducing the complete transcript of the prior proceedings, by presenting testimony from persons who witnessed the proceedings, or by presenting testimony from a member of the [ ] jury." *United States v. Leon–Reyes*, 177 F.3d 816, 820

(9th Cir.1999) (citations omitted); see also *United States v. Cosby*, 601 F.2d 754, 757 (5th Cir.1979) ("we have generally looked with disfavor on prosecutions brought under Section 1623 that have not used complete transcripts or testimony of members of the [ ] jury").

Count 47 charges that defendant knowingly made a false material declaration at his first trial when he adopted as true his prior testimony that none of his tonsillectomy patients had complained to him about "loss of taste." At trial, defendant argued that although some patients had complained of distorted taste, no patient had complained about loss of taste. Defendant now argues that the government did not show that the distinction between loss of taste and distorted taste was material. The government argues that (1) the indictment in the first case charged that defendant did not inform Nancy Drew that prior patients had experienced loss of taste following tonsillectomy surgery, (2) the testimony about loss of taste concerned the credibility of government witnesses William Gardner and Nancy Drew, both of whom testified at the first trial, and (3) all testimony that a defendant gives is material to his credibility.

■■■ As to the government's first and second arguments, the Court notes that the indictment from the first case was not admitted into evidence at the second trial and neither Gardner nor Drew testified in the second case about the substance of their testimony in the prior trial. As to the government's third argument, the Court notes that the government bears the burden of proving materiality. See *United States v. Durham*, 139 F.3d 1325, 1329 (10th Cir.1998); *United States v. Allen*,

892 F.2d 66, 67 (10th Cir.1989). Accordingly, the government must show that "the credibility of the defendant [was] an issue capable of influencing the jury." *United States v. Akram*, 152 F.3d 698, 702 (7th Cir.1998); see *United States v. Burke*, No. 86–321–Z, 1986 WL 14092, at *1 (D.Mass. 1986) ("Although the cases have stated broadly that any false statement affecting the credibility of a witness will generally constitute perjury, that rule cannot be used to eliminate the materiality requirement of the statute."). "For example, certain lies on cross-examination might be too trivial to count as being relevant to the question of credibility. Similarly, some cases might involve such irrefutable and objective proof that the issue of the defendant's credibility is itself a minor consideration and not one capable of influencing the jury's decision." *Akram*, 152 F.3d at 702. Absent evidence of the nature of the charges against defendant in the first trial and the proof offered in the first trial, the jury could not find that defendant's credibility on the loss of taste versus distorted taste issue was material to the issues in the first trial.

■■■ As to Count 46, defendant argues that the government did not show that defendant's testimony about the computer system was material.[2] The government argues that this testimony was relevant at the first trial with respect to the credibility of Dr. Holdcraft and defendant. As to Dr. Holdcraft's credibility, the government did not introduce her testimony from the prior trial or explain the relevance of her testimony to the charges at the prior trial. As to defendant's credibility, the government did not satisfy its burden to show that defendant's statements in Count 46 were

---

**2.** The indictment alleges that at the first trial, defendant falsely testified that his disagreement with Dr. Holdcraft about a new computer system was one of the reasons he terminated the partnership with her. See First

Superseding Indictment (Doc. # 12) ¶¶ 39–40. The government claims that defendant invented the disagreement about the computer system in an attempt to undermine the credibility of Dr. Holdcraft. See *id.* ¶ 40.

material to the issues in the first trial. A few vague references to the fact that there was a prior trial involving defendant and "similar" issues is insufficient to show that defendant's credibility on the computer system issue was material to the issues in the first trial. See *United States v. Damato*, 554 F.2d 1371, (5th Cir.1977) (materiality cannot be established by suspicion and conjecture).

Defendant also reasserts his previous objection to the perjury counts based on ambiguity. For the reasons previously stated, the Court rejects defendant's argument on ambiguity. See *United States v. Daniels*, 174 F.Supp.2d 1209, 1212–14 (D.Kan.2001) (overruling motion for judgment of acquittal); *United States v. Daniels*, 159 F.Supp.2d 1285, 1295–97 (D.Kan. 2001) (overruling motion to dismiss).

None of defendant's objections to materiality or ambiguity address Count 44, which alleges that defendant lied about whether he instructed residents at KU Medical Center to "tap dance on the charts." Accordingly, even if the Court had jurisdiction to grant him judgment of acquittal on Counts 46 and 47 based on the absence of proof of materiality, defendant's perjury conviction on Count 44 would stand.

Because defendant's motion is untimely and defendant did not seek an extension within the seven-day period, the Court overrules the motion for judgment of acquittal.

## III. Defendant's Motion For A New Trial

### A. Rebuttal Testimony Of Dr. Kidder

■ Defendant argues that the Court erred by allowing Dr. Kidder to testify as a government expert in rebuttal. The Court's evidentiary rulings are reviewed for abuse of discretion. See *United States v. Davis*, 40 F.3d 1069, 1073 (10th Cir. 1994), cert. denied, 514 U.S. 1088, 115 S.Ct. 1806, 131 L.Ed.2d 732 (1995). At trial, the Court overruled defendant's objection on two grounds. First, the Court found that defendant's objection was untimely. Defendant had been on notice of the government's intent to use Dr. Kidder as an expert since April of 2001. See Government's Response to Defendant's Motion To Exclude Government Expert Dr. Thomas Kidder (Doc. # 165) filed November 15, 2001 at 13; Herbert Daniels' Motion To Exclude Cumulative Government Expert Thomas Kidder (Doc. # 164) filed November 14, 2001 at 3 (conceding that government had identified Dr. Kidder as a potential expert). Defendant's unexplained delay in objecting to Dr. Kidder as an expert witness—waiting until three court days before he was scheduled to testify—amounts to sandbagging. The purpose of requiring early notice of witnesses is to promote resolution of disputes before trial and allow a party to pursue an alternative course if the Court strikes a proposed witness. Defendant knew since April 1998 that the government might use Dr. Kidder as an expert witness at trial. In addition, he knew that despite the retainer agreement with defense counsel, the government had filed a motion to compel Dr. Kidder to testify before the grand jury. Defendant simply sat on this issue until the end of his case, with knowledge that the issue was hotly contested, in an apparent effort to leave the government no expert rebuttal witness.[3] Based on un-

---

**3.** At oral argument in November of 2001, defense counsel attempted to explain the delay by noting that they had relied on the representation of prior defense counsel about the contents of Judge Crow's order related to the grand jury subpoena to Dr. Kidder. Present defense counsel explained that they did

timeliness alone, the Court at trial overruled defendant's objection to testimony by Dr. Kidder. Defendant does not dispute that portion of the Court's ruling in his motion for new trial.

At trial, the Court also overruled defendant's objection to Dr. Kidder on the merits. In particular, the Court found that the prior retainer agreement was void as against public policy. See *Jones v. Trump*, 971 F.Supp. 783, 788 (S.D.N.Y. 1997) ("[I]t can scarcely be debated that agreements to refrain from assisting a criminal prosecution violate public policy by undermining society's criminal laws."). The Court explained at trial that a party cannot "lock up" witnesses or experts and preclude them from testifying for the opposing party. See *Kirk v. Raymark Indus., Inc.*, 61 F.3d 147, 164 (3d Cir.1995), cert. denied, 516 U.S. 1145, 116 S.Ct. 1015, 134 L.Ed.2d 95 (1996) (experts are "supposed to testify impartially in the sphere of their expertise"); *United States v. Cadet*, 727 F.2d 1453, 1469 (9th Cir.1984) ("Witnesses, particularly eyewitnesses, to a crime are the property of neither the prosecution nor the defense. Both sides have an equal right, and should have an equal opportunity, to interview them.") (citation and internal quotations omitted); *Gregory v. United States*, 369 F.2d 185, 188 (D.C.Cir.1966) ("A criminal trial, like its civil counterpart, is a quest for truth. That quest will more often be successful if both sides have an equal opportunity to interview the persons who have the information from which the truth may be determined."). To allow a defendant in a criminal case to lock up an expert or experts who may render an adverse opinion would undermine the ability of the United States Attorney to prosecute crimes. Accordingly, the Court declined to enforce the terms of the retainer agreement to prohibit Dr. Kidder from voluntarily testifying for the government as an expert witness.

In his motion for new trial, defendant renews his argument that the Court erred by allowing Dr. Kidder to testify. Defendant does not offer any additional authority or argument. For the reasons stated on the record and those set forth above, the Court finds that defendant's objection to the testimony of Dr. Kidder should be overruled.

**B. Discovery Of The Notes Of Dr. Holdcraft And Dr. Rice**

Defendant argues that the Court erred because it did not require the government to produce certain notes related to Dr. Holdcraft and Dr. Rice.

Dr. Holdcraft testified that government counsel and agents took down certain information that she dictated to them, and that a lot of the statements were reread to ensure that they were correct. At a subsequent hearing outside the presence of the jury, Dr. Holdcraft testified that she never saw what government counsel typed, that they never asked her to review a written statement, and that she never adopted the notes of government counsel as her own statement. The Court ruled that her somewhat conflicting testimony was sufficient to raise the possibility that she had adopted or approved the government's notes or that the notes were a substantially verbatim recital of her state-

not actually review Judge Crow's order until November 2001, after the government announced that it intended to call Dr. Kidder in rebuttal. This purported explanation for the delay is unavailing. Present defense counsel entered their appearances before the government notified them in April 2001 of its intent to use Dr. Kidder as an expert witness. To the extent that a review of Judge Crow's order was necessary to assert an objection to Dr. Kidder's testimony, such a review should have been conducted well before November of 2001.

ment. See Memorandum And Order (Doc. # 135) filed October 19, 2001 at 4. Accordingly, the Court ordered the government to produce under seal all notes of government counsel or agents regarding their interviews of Dr. Holdcraft. See id. at 4. After the Court reviewed the notes, it ruled that they did not constitute a witness statement under the Jencks Act, 18 U.S.C. § 3500(e), and Rule 26.2, Fed.R.Crim.P. See Order (Doc. # 146) filed October 29, 2001; Order (Doc. # 142) filed October 24, 2001. Defendant now renews his initial argument that Dr. Holdcraft's testimony was sufficient to establish that the notes were discoverable. As the Court previously explained, the testimony of Dr. Holdcraft, by itself, was insufficient to require the government to produce the notes. Because her testimony was somewhat ambiguous and out of an abundance of caution, however, the Court reviewed the notes *in camera.* After the *in camera* review, the Court was convinced that the notes were not discoverable. Defendant has not explained how that ruling was in error or how his substantial rights were affected by the failure to require production of the notes. Accordingly, his motion for new trial on that ground is overruled.

Dr. Rice testified on cross-examination that during his review of materials for trial, he took handwritten notes. Defendant asked the government to produce those notes. Dr. Rice did not have the notes with him at trial, so the Court ordered the government to obtain the notes and determine whether they contained any information discoverable under Rule 16(a)(1)(C), Fed.R.Crim.P., or Brady. After review of the notes, the government stated that they were not discoverable because they were not material to the question of defendant's guilt. See Government's Memorandum Concerning The Production Of Dr. Dale Rice's Handwritten Notes (Doc. # 138) filed October 22, 2001. At trial, defendant did not dispute

the government's representation or ask the Court to independently review the notes. Defendant now argues that the notes should have been produced because they were Dr. Rice's contemporaneous thoughts as he reviewed the case. Although he argues that these "statements" should have been made available to him, defendant has not cited any authority for his request. The Court again finds that Dr. Rice's rough notes are not discoverable under the Jencks Act or Brady. An expert "may reserve judgment about his draft [or impressions] until he reviews [the report] in final, signifying his approval only when he affixes his signature to the completed document." *United States v. Thomas,* 97 F.3d 1499, 1502 (D.C.Cir. 1996); see *United States v. Hinton,* 719 F.2d 711, 722 (4th Cir.1983) ("investigative notes of a government agent, made in the course of interviewing witnesses, which are later incorporated in the agent's formal 302 report, are not statements within the meaning of Section 3500(e)(1)"), cert. denied, 465 U.S. 1032, 104 S.Ct. 1300, 79 L.Ed.2d 699 (1984); *United States v. Soto,* 711 F.2d 1558, 1562 (11th Cir.1983) (rejecting view that rough notes or rough draft prepared by a government agent becomes Jencks Act material merely because the agent uses such material to prepare his final report); see also *United States v. Shovea,* 580 F.2d 1382, 1389–90 (10th Cir.1978) (district court did not err by refusing to strike agent's testimony where agent had destroyed rough notes of another agent which were incorporated into final report), cert. denied, 440 U.S. 908, 99 S.Ct. 1216, 59 L.Ed.2d 456 (1979). Defendant does not dispute that the government produced a final report by Dr. Rice pursuant to Rule 16(a)(1)(E), Fed. R.Crim.P. Moreover, defendant did not seek additional explanation of the basis of the government's conclusion that the notes were not Brady material. Finally, defen-

dant has not shown how his substantial rights were affected by the failure to require the production of Dr. Rice's notes. For these reasons, defendant's motion for new trial is overruled with regard to the Court's ruling on the discovery of Dr. Rice's notes.

### C. Limitation On Cross Examination Of Patient Witnesses

■ Defendant argues that the Court improperly limited cross-examination of patients with regard to prior medical treatment. In several instances, the Court sustained the government's objection to the relevancy of such evidence. A district court is granted broad discretion in ruling on the relevancy of evidence. See *United States v. Alexander*, 849 F.2d 1293, 1301 (10th Cir.1988). A new trial is warranted only if defendant shows an abuse of that discretion. See *id.* "[M]erely limiting the scope of cross-examination is a matter well within the trial judge's discretion and such an error 'will not lead to reversal unless an abuse of discretion, clearly prejudicial to the defendant, is shown.'" *United States v. Rosario Fuentez*, 231 F.3d 700, 704 (10th Cir.2000) (quoting *United States v. Valentine*, 706 F.2d 282, 288 (10th Cir.1983)).

Defendant has not set forth how the Court's rulings were either incorrect or prejudicial. Defendant argues generally that the Court's limitations on cross-examination precluded him from challenging the government's witnesses in two ways: one, he could not inquire on cross-examination into the medical history of particular patients when the medical history supported the accuracy of defendant's records and medical judgment; and two, the preclusion of certain examinations disturbed the defense ability to impeach patient witnesses by presenting evidence in defendant's case-in-chief. See defendant's Motion For Judgment Of Acquittal And New Trial (Doc. # 183) filed December 13, 2001 at 12. Absent explanation why a specific ruling was in error,[4] however, the Court must overrule defendant's general objection for the reasons stated on the record at trial. Defendant simply has not shown any potential prejudice from the Court's rulings which would warrant a new trial.

### D. Exclusion Of Prior And Subsequent Treatment Records

Defendant also raises a general objection to numerous evidentiary rulings with regard to medical records. As explained above, the Court has broad discretion in ruling on the relevancy of evidence. See *Alexander*, 849 F.2d at 1301. "A defendant is entitled to a new trial only if there is a reasonable possibility that the exclusion of the evidence had a prejudicial effect upon the jury's verdict." *United States v. Cueto*, 151 F.3d 620, 637–38 (7th Cir.1998) (internal quotations and citation omitted); see Fed.R.Crim.P. 52(a) ("Any error ... which does not affect substantial rights shall be disregarded.").

■ Defendant argues generally that (1) the Court did not admit records of physicians who treated the individuals identified in the indictment, (2) the Court did not admit hospital records that specifically detailed the hospital's informed consent process for the patients identified by the government and (3) the Court deemed irrelevant many of defendant's own records that he created when caring for the

---

4. Defendant does cite one example, "the cross-examination of Michelle Union relating to treatment and care provided by various physicians." Defendant's Motion For Judgment Of Acquittal And New Trial (Doc. # 183) filed December 13, 2001 at 12. This objection also is too vague for the Court to decipher which rulings defendant objects to, but the Court notes that it allowed defendant to attempt to impeach Ms. Union through the direct testimony of Dr. Applebaum and Dr. Thedinger.

individuals named in the indictment. As to the first and third arguments, the Court must overrule these general objections, which challenge numerous unspecified evidentiary rulings, for the reasons stated on the record at trial. As to the second objection, the Court notes that it admitted a standard hospital consent form and allowed defense counsel to question patient witnesses about the form. Defendant has not shown that admission of the completed consent form would have added anything to the jury's understanding of the consent process. Indeed, the relevant issue at trial was whether defendant's medical records correctly claimed that patients had given their informed consent *during prior office visits*. Finally, as to all three of defendant's objections, he has not shown any potential prejudice from the Court's rulings which would warrant a new trial.

### E. Failure To Issue Instruction On Informed Consent

Defendant claims that he is entitled to a new trial because the Court did not instruct the jury on "informed consent" under Kansas law. In reviewing challenges to jury instructions, the Court must look at the jury instructions as a whole and determine if the jury likely was misled. See *United States v. Smith*, 13 F.3d 1421, 1424 (10th Cir.1994) (citing *United States v. Mullins*, 4 F.3d 898, 900 (10th Cir.1993)). A new trial is not appropriate where the instructions as a whole properly state the law and provide the jury an "intelligent, meaningful understanding of the applicable issues and standards." *United States v. Winchell*, 129 F.3d 1093, 1096 (10th Cir.1997) (quoting *United States v. Laughlin*, 26 F.3d 1523, 1528 (10th Cir.1994)). The Court will grant a new trial only if it has "substantial doubt that the jury was fairly guided." *Smith*, 13 F.3d at 1424 (quoting *Mullins*, 4 F.3d at 900).

The standard informed consent instruction, which is commonly used in civil malpractice cases, was completely unnecessary to instruct the jury on the pertinent elements of health care and mail fraud. The government did allege that defendant covered up his fraud by falsifying the informed consent of patients, see First Superseding Indictment ¶ 17(c)(2), but that allegation did not require proof of a violation of Kansas law on informed consent. At trial, the government showed that defendant routinely stated at the end of each patient's chart that the patient "understands the procedures, risks, complications and alternatives and gives informed consent." A detailed instruction on informed consent, as proposed by defendant, would have confused the jury and may have misled the jury to believe that if defendant satisfied Kansas law on informed consent, he was necessarily innocent of health care fraud or mail fraud. Moreover, such a detailed instruction would have unduly emphasized a single allegation of fraud without providing similar guidance on other charges. Finally, based on the trial testimony and common sense, the jury understood the concept of informed consent sufficient to determine whether defendant falsified his medical records. For these reasons, the Court finds that its failure to give an instruction on informed consent does not require a new trial.

**IT IS THEREFORE ORDERED** that defendant's Motion For Judgment Of Acquittal And New Trial (Doc. # 183) filed December 13, 2001 be and hereby is **OVERRULED.**